OAKTON DISTRIBUTORS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11900–77R.     Filed October 30, 1979.

*Robert W. Manly,* for the petitioner.

*Stephen J. Morrow, Bernard B. Kornmehl,* and *Elizabeth DePriest,* for the respondent.

OPINION

FEATHERSTON, *Judge:* Respondent retroactively revoked a determination that the profit-sharing plan adopted by petitioner meets the requirements of section 401(a).[1] Petitioner challenges respondent's revocation and has invoked the jurisdiction of this Court for a declaratory judgment under section 7476.

The issues presented for decision are:

(1) Whether a profit-sharing plan which was adopted on December 15, 1972, effective January 1, 1972, and for which a final favorable determination letter was issued March 2, 1973, may in March 1977, be retroactively amended to remove a disqualifying provision.

(2) Whether respondent has abused his discretion by retroactively revoking a prior favorable determination letter issued with respect to petitioner's profit-sharing plan.

This case was submitted for decision on the stipulated administrative record under Rule 217, Tax Court Rules of Practice and Procedure.

Petitioner Oakton Distributors, Inc., is an Illinois corporation located in Franklin Park, Ill. It files its Federal income tax

---

[1]All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

returns on the calendar year basis. On April 9, 1970, petitioner adopted a money purchase pension plan effective May 1, 1970. The contribution formula of the plan was 6 percent of the first $7,800 of compensation and 12 percent of compensation in excess of $7,800. This formula produced integration with Social Security to the maximum amount then allowed; in other words, the extent of integration was 100 percent.[2] On September 9, 1970, the District Director issued a determination that the plan qualified under section 401(a) and that the trust was exempt from taxation under section 501(a).

On December 15, 1972, petitioner adopted a profit-sharing plan effective January 1, 1972, contributions to which were allocated on a basis integrated with Social Security. The employer allocation formula was 7 percent of compensation in excess of $9,000, with the balance in proportion to compensation. Because the guidelines in the revenue ruling then in effect established a limitation of 7 percent of compensation in excess of the plan's integration level, this formula produced integration with Social Security in the maximum amount allowed; in other words, the extent of integration was 100 percent. Rev. Rul. 71–446, 1971–2 C.B. 187, 190, 194, secs. 6.01 and 15. The profit-sharing plan covered the same employees as did the pension plan.

The application form for qualification of the profit-sharing plan, Form 4573, dated December 15, 1972, asked for information on other qualified plans to which the employer contributed. After listing the pension plan, petitioner gave the following response to the question, "Rate of employer contribution, if fixed:" "10 percent of compensation." On March 2, 1973, the District Director issued a final favorable determination letter with respect to the profit-sharing plan.

On May 28, 1976, petitioner requested the District Director to determine that the profit-sharing plan and trust, as amended to comply with the Employee Retirement Income Security Act of

---

[2]The extent of integration of a plan is the ratio, expressed as a percentage, which the employer contribution rate, actual benefits, benefit rate, offset rate, or allocation rate bears to the applicable limitation established by the Internal Revenue Service. Guidelines in effect during the period in which the money purchase plan was formed allowed a limitation of 6 percent of compensation in excess of $7,800. Rev. Rul. 69–4, 1969–1 C.B. 118, 122, sec. 13. The extent of integration is therefore 6/6, or 100 percent. Subsequent guidelines allowed contributions not exceeding 7 percent of actual compensation. Rev. Rul. 71–446, 1971–2 C.B. 187, 190, 194, secs. 6.01 and 14. Under these guidelines, the extent of integration is 86 percent.

1974 (ERISA), Pub. L. 93–403, 88 Stat. 829, continued to qualify under sections 401(a) and 501(a). In response to the Form 5301 (Application for Determination for Defined Contribution Plan) question "Rate of employer contribution, if fixed," of other qualified plans, petitioner stated that contributions to the pension plan were "6% of 7800 – 12% of excess."

Upon examination of the request, the District Director's Office first became aware that the pension and profit-sharing plans were, in combination, integrated with Social Security in excess of the maximum amount allowable and pointed out to petitioner the existence of excess integration. By a letter dated September 17, 1976, petitioner's attorney, Robert W. Manly (Manly), transmitted a draft of a proposed amendment which did not relate to integration with Social Security. In a postscript to the letter, he stated:

We have determined to integrate the profit sharing plan but to abandon integration of the pension plan in 1976. For earlier years we will abandon integration of the profit sharing (which was adopted in error) and reallocate contributions without integration but we will not change the pension plan for years prior to 1976.

By a letter dated December 15, 1976, Manly transmitted a certified copy of corporate resolutions dated December 7, 1976, and an unexecuted copy of a proposed first amendment to the profit-sharing plan dated December 20, 1976, together with a schedule showing accounts of all participants in the profit-sharing plan as restated pursuant to the proposed amendment as if it had been in effect from 1972 through 1975.

The corporate resolution adopted, effective May 1, 1977, a money purchase pension plan to which petitioner's contributions would be "10% of the annual compensation of each participant's allocation on a non-integrated basis," and directed its officers to submit the plan to the Internal Revenue Service for determination of qualification and to execute any amendments required to obtain a favorable determination. It also rescinded the provision of the profit-sharing plan which provided that contributions be allocated to employees on a basis integrated with Social Security and authorized and directed its officers to restate the accounts of all participants to reflect a reallocation of contributions as though the profit-sharing plan had been nonintegrated for the years ended December 31, 1972 through 1977. However, the resolution reconfirmed the amendment and restatement dated

May 3, 1976, to the profit-sharing trust which provided for contributions allocated on a basis integrated with Social Security effective January 1, 1978. Reallocation of the profit-sharing contributions adversely affected only the one highly paid employee, who was also the corporation's president and sole shareholder.

By letter dated April 27, 1977, Manly transmitted a certified copy of a Unanimous Consent to Corporate Action by Directors dated March 10, 1977, which authorized and directed adoption of an amendment to the profit-sharing plan requiring allocation of contributions without integration, a copy of the proposed amendment to that plan, and a schedule of account balances for each participant as originally calculated and as recalculated pursuant to the amendment. The letter described the proposed amendment as one "which will be adopted if your office approves of this proposal" and concluded: "Please advise us of your reaction to this proposal."

On August 31, 1977, the District Director issued a final adverse determination letter with respect to the profit-sharing plan for 1972. The reason given for disqualification was that the pension plan and the profit-sharing plan each covered the same employees and each was integrated with Social Security to the maximum extent allowed for individual plans, resulting in violation of section 401(a)(5) and section 1.401–3(e), Income Tax Regs.

By a letter dated March 10, 1978, Goldman, Weiss, Gelman & Sered, certified public accountants, presented to petitioner's trustees unaudited financial statements in which account balances of participants in the profit-sharing plan were restated as of January 1, 1978, as though the plan had been nonintegrated from inception through December 31, 1977.

### 1. *Retroactive Amendment Issue*

Relying on both section 401(b) and the case law, petitioner argues that the March 1977 corporate action retroactively removed the disqualifying profit-sharing plan provision as well as the past impact of that provision on participants' account balances. Petitioner thus concedes that the profit-sharing plan,

in its initial form, provides for integration in excess of the amount allowed by section 401(a)(5),[3] and thereby violates the antidiscrimination requirement of section 401(a)(4),[4] but argues that, at the time of the August 1977 revocation, discrimination was no longer present. Respondent, on the other hand, maintains that the defective plan cannot be qualified at that time by retroactive amendments.[5] We agree with respondent.

A plan which would not otherwise satisfy the requirements of section 401(a) may qualify if, due to retroactive changes, "all provisions of the plan which are necessary to satisfy such requirements are in effect by the end of * * * [the remedial amendment] period and have been made effective for all purposes for the whole of such period." Sec. 401(b).[6] Under the regulations, retroactive amendments may be made to specified "disqualifying provisions" during a defined (see n. 8 *infra*) "remedial amendment period" and specified extensions of that period. Sec. 1.401(b)–1(a), (b), (c), and (d), Income Tax Regs. In addition, section 1.401(b)–1(e), Income Tax Regs., authorizes the Commissioner to further extend the remedial amendment period at his discretion.[7]

---

[3] Sec. 401(a)(5) states in pertinent part as follows:

A classification shall not be considered discriminatory within the meaning of paragraph (3)(B) or (4) merely because * * * the contributions or benefits based on that part of an employee's remuneration which is excluded from "wages" by section 3121(a)(1) differ from the contributions or benefits based on employee's remuneration not so excluded, or differ because of any retirement benefits created under State or Federal law. * * *

[4] Sec. 401(a)(4) states as follows:

(a) REQUIREMENTS FOR QUALIFICATION.—A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section—

(4) if the contributions or benefits provided under the plan do not discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees.

[5] Respondent also questions whether the amendment to the profit-sharing plan was in fact adopted and the account balances actually restated. Due to our disposition of the issue, we do not reach this alternate theory.

[6] Sec. 401(b) provides as follows:

(b) CERTAIN RETROACTIVE CHANGES IN PLAN.—A stock bonus, pension, profit-sharing, or annuity plan shall be considered as satisfying the requirements of subsection (a) for the period beginning with the date on which it was put into effect, or for the period beginning with the earlier of the date on which there was adopted or put into effect any amendment which caused the plan to fail to satisfy such requirements, and ending with the time prescribed by law for filing the return of the employer for his taxable year in which such plan or amendment was adopted (including extensions thereof) or such later time as the Secretary may designate, if all provisions of the plan which are necessary to satisfy such requirements are in effect by the end of such period and have been made effective for all purposes for the whole of such period.

[7] Sec. 1.401(b)–1(e), Income Tax Regs., provides in part:

This provision, upon which petitioner relies, confers discretionary authority on the Commissioner. When reviewing discretionary administrative acts, this Court may not substitute its judgment for that of the Commissioner. The exercise of such discretionary power will not be disturbed unless the Commissioner has abused his discretion. And petitioner's burden of proof is greater than that of the usual preponderance of the evidence. *Pulver Roofing Co. v. Commissioner*, 70 T.C. 1001, 1011 (1978); accord, *Commissioner v. Pepsi-Cola Niagara Bottling Corp.*, 399 F.2d 390, 393 (2d Cir. 1968), revg. 48 T.C. 75 (1967).

However, as we view the facts, even under the usual burden-of-proof standard, petitioner cannot prevail. As petitioner itself concedes, it did not at any time file a request for extension of the remedial amendment period—a requirement under the regulation. Moreover, such a request must be submitted before the remedial amendment period would otherwise expire or within a later period deemed "reasonable under the circumstances" by the Internal Revenue Service. Sec. 1.401(b)–1(e), Income Tax Regs. In the case of a disqualifying provision in a new plan for which a determination letter is issued by the Internal Revenue Service on or before September 28, 1976, a transitional rule provides that the remedial amendment period "not end prior to the expiration of 150 days beginning on the date of such final determination." Sec. 1.401(b)–1(d)(4), Income Tax Regs.[8] Here

---

(e) *Discretionary extensions.* At his discretion, the Commissioner may extend the remedial amendment period or may allow a particular plan to be amended after the expiration of its remedial amendment period and any applicable extension of such period. In determining whether such an extension will be granted, the Commissioner shall consider, among other factors, whether substantial hardship to the employer would result if such an extension were not granted, whether such an extension is in the best interest of plan participants, and whether the granting of the extension is adverse to the interests of the Government. * * * With regard to a particular plan, a request for extension of time pursuant to this paragraph shall be submitted prior to the expiration of the remedial amendment period determined without regard to this paragraph, or within such time thereafter as the Internal Revenue Service may consider reasonable under the circumstances. The request should be submitted to the appropriate District Director, determined under section 601.201(o)(3)(xii) of this chapter (Statement of Procedural Rules). This subparagraph applies to disqualifying provisions that were adopted or became effective prior to September 2, 1974, as well as disqualifying provisions adopted or made effective on or after September 2, 1974.

[8]Petitioner does not argue that its amendment was undertaken within the normal remedial amendment period. The length of that period is nonetheless pertinent to the inquiry whether respondent abused his discretion. In the instant case, the parties agree that failure to meet the requirements of sec. 401(a) is due to the allocation formula of the profit-sharing plan in its original form. Thus, the disqualifying provision is "a provision of a new plan." Sec. 1.401(b)–1(b)(1), Income Tax Regs. The remedial amendment period thus begins on the date the plan is put into effect—Jan. 1, 1972. Sec. 1.401(b)–1(c)(1)(i), Income Tax Regs. The remedial amendment period ends, unless further extended, with the later of two dates. The first is the date, including extensions, for filing the income tax return of the employer for the employer's taxable year in which the remedial amendment period

the initial determination for the profit-sharing plan was issued March 2, 1973; the remedial amendment period was thus extended until July 30, 1973. Yet, petitioner first suggested an amendment to the plan on September 17, 1976, more than 3 years later. In our view, it was not arbitrary and capricious for the Internal Revenue Service under section 401(b) and the related regulations to regard a period of more than 3 years as not reasonable under the circumstances.

Petitioner concedes that it filed no document denominated "a request for extension." It argues, however, that references to a proposed amendment in its correspondence with the District Director constitute such a request. A fair reading of the administrative record does not support petitioner's contention. The record contains no correspondence of any kind between March 2, 1973, the date on which the profit-sharing plan was approved, and May 28, 1976, the date on which a determination with respect to compliance with ERISA was requested. The proposed amendment to eliminate excess integration is first mentioned in a letter written September 17, 1976, a date long after the applicable remedial amendment period had expired. Accordingly, even if the letter were deemed a request for extension, it would not be timely.

Arguing that "substantial hardship to the employer" and the "best interest of plan participants," within the meaning of section 1.401(b)–1(e), Income Tax Regs., quoted in note 7 *supra*, require a further extension, petitioner notes the adverse consequences to the employer and employees which attend denial of qualified status to the plan. Yet petitioner has cited no hardships other than those which ordinarily flow from loss of qualified status for plans. Furthermore, to accept petitioner's position

---

begins. Since the corporate employer's taxable year is the calendar year, this date is Sept. 15, 1973, 6 months from the date of filing for corporations. See secs. 6072(b) and 6081(a). The second date is the last day of the plan year on which the remedial amendment period begins, or Dec. 31, 1972. Petitioner filed a request for determination with respect to the qualification of the plan on Dec. 15, 1972, before expiration of this period on Sept. 15, 1973, thus extending the period until 91 days after the Mar. 2, 1973, issuance of the final determination letter. Sec. 1.401(b)–1(d)(3)(i), Income Tax Regs. Because the requirements of sec. 1.401(b)–1(d)(3)(i), Income Tax Regs., were met and because the final determination was issued on or before Sept. 28, 1976, the remedial amendment period is further extended until the expiration of 150 days beginning Mar. 2, 1973, or July 30, 1973. Sec. 1.401(b)–1(d)(4), Income Tax Regs. We note that the 1976 request for determination does not effect a further extension because it was not made before the normal remedial amendment period ended on Sept. 15, 1973. See sec. 1.401(b)–1(d)(3), Income Tax Regs.

would, in our view, be tantamount to requiring that the Internal Revenue Service extend the remedial amendment period in any or every case in which it discovers a defect in the original plan while ruling on a request for determination that plan amendments qualify. Such a requirement would not comport with the legislative intent behind the 1974 amendment to section 401(b).

Prior law allowed remedial corrections to plans but not to plan amendments and only during a period often no longer than 2½ months. Believing that the provision was unduly restrictive, Congress altered section 401(b) to allow retroactive correction of plan amendments, to enlarge the usual remedial amendment period, and to authorize the Commissioner to grant extensions for reasonable cause. The committee reports mention as an example of reasonable cause the filing of a request for a determination of qualification. H. Rept. 93–779 (1974), 1974–3 C.B. 244, 407. There is no indication, however, that Congress intended a request for determination that a plan amendment is qualified to be the occasion for extension of the remedial amendment period for an unrelated provision in the original plan.

The parties agree that retroactive corrections to plans have been allowed by courts relying on principles other than section 401(b). They disagree, however, as to the application of the law to the instant case.

Terming section 401(b) a "safe harbor" provision, this Court has held that an amendment made July 1, 1971, should be given retroactive effect in a case in which the Internal Revenue Service delayed in advising the taxpayer that amendments would be necessary and in which the objectionable provisions never came into effect. *Aero Rental v. Commissioner*, 64 T.C. 331, 339–342 (1975).[9] The *Aero Rental* holding is based on two factors, that the objectionable provisions were never brought into operation and that the employer exercised reasonable diligence in applying for a determination letter with respect to the plan. *Mendenhall Corp. v. Commissioner*, 68 T.C. 676, 681 (1977). In *Mendenhall*, however, retroactive correction was not permitted because the taxpayer, having waited over 5 years

---

[9]As an alternative ground, we relied on sec. 401(b) as amended subsequent to the filing of briefs. Because the provision as revised applied to rulings already granted, the Court held that respondent's refusal to accept a retroactive amendment was contrary to the legislative intent. *Aero Rental v. Commissioner*, 64 T.C. 331, 342 (1975).

before requesting a determination letter, failed the reasonable diligence requirement. *Mendenhall v. Commissioner, supra* at 681–682.

In the instant case, petitioner satisfies neither requirement set forth in *Mendenhall*. Taken in conjunction with the pension plan contribution formula, the profit-sharing allocation formula constitutes a disqualifying provision. Contributions were from the outset allocated in accordance with this formula. To be sure, petitioner diligently requested determinations of initial and continuing qualification of the profit-sharing plan. Yet, because it proposed no remedial amendment until 3½ years after the initial favorable determination letter, it was not diligent in removing the defect from the original plan.

The case law, petitioner contends, permits retroactive correction of plan defects if such correction is undertaken prior to a final adverse determination and without bargaining for a favorable determination. In our view, petitioner has misconstrued the cases upon which it relies. Petitioner states that in *Ludden v. Commissioner*, 68 T.C. 826 (1977), we held "there should be no retroactive disqualification of the plan when the error was corrected without the use of a promise to correct as a bargaining tool." In fact, *Ludden* upheld a retroactive disqualification; we found that the error in that case had not been corrected and that the employer's offer to do so was conditioned on a favorable determination. We merely mentioned the possibility, in dictum, that a voluntary correction made without bargaining might preclude retroactive revocation. *Ludden v. Commissioner, supra* at 832–835. Even if petitioner's statement of the *Ludden* holding were correct, however, we do not agree that the March 1977 amendments were not made as part of a bargaining process. Manley's April 27, 1977, letter states that amendments "will be adopted if your office approves of this proposal," thus indicating that the promise to correct indeed was used as a bargaining tool.

Petitioner suggests that the holdings in *Lansons, Inc. v. Commissioner*, 69 T.C. 773 (1978), on appeal (5th Cir., Aug. 28, 1978), and *Time Oil Co. v. Commissioner*, 258 F.2d 237 (9th Cir. 1958), remanding 26 T.C. 1061 (1956), were based in part on retroactive correction of defects. The provision amended in *Lansons, Inc. v. Commissioner, supra* at 786, was not found to disqualify the plan. Among other operational deviations, the

trustees in *Time Oil* failed to make timely distributions to the employees; distributions were, however, made prior to trial. The court did not view the delay in carrying out this plan provision to disqualify the plan. *Time Oil Co. v. Commissioner, supra* at 239. In contrast, there is no dispute here that the profit-sharing plan allocation formula, the subject of amendment, is a disqualifying provision.

*Quinn v. United States*, an unreported case (D. Md. 1976, 40 AFTR 2d 77–5097, 77–1 USTC par. 9369), is distinguishable on two grounds. Discrimination in that case occurred not because the plan was defective but because contributions were based, in part, on the unreasonable compensation of one participant. The court also noted that Rev. Rul. 67–341, 1967–2 C.B. 156, specifically provided a method of removing discrimination by reallocating the unreasonable amount to other participants. No such authority exists in the instant case.

## 2. *Retroactive Revocation Issue*

Petitioner contends that respondent abused his discretion by refusing to limit the retroactive effect of the revocation. In support of its position, petitioner relies on the discretion given the Commissioner by section 7805(b) and the related administrative guidelines. Respondent, on the other hand, maintains that retroactive revocation was proper because petitioner omitted a material fact in its application for qualification of the profit-sharing plan. We sustain respondent's determination.

Respondent is authorized to determine the extent to which a revocation of a determination letter will be applied without retroactive effect. Sec. 7805(b); sec. 301.7805–1(b), Proced. & Admin. Regs.[10] We must uphold the retroactive revocation in the instant case unless respondent has abused his discretion. *Automobile Club v. Commissioner*, 353 U.S. 180, 184 (1957); *Lowry Hospital Association v. Commissioner*, 66 T.C. 850, 860 (1976). Accord, *Wisconsin Nipple & Fabricating Corp. v. Commissioner*, 581 F.2d 1235, 1237–1239 (7th Cir. 1978), affg. 67 T.C. 490 (1976). A retroactive revocation does not constitute an abuse of discretion if respondent was not accurately informed of all

---

[10]Sec. 301.7805–1 Rules and regulations.

(b) *Retroactivity.* * * * The Commissioner may prescribe the extent, if any, to which any ruling relating to the internal revenue laws, issued by or pursuant to authorization from him, shall be applied without retroactive effect.

material facts when he issued the determination. *Kenner v. Commissioner*, 318 F.2d 632, 636 (7th Cir. 1963), affg. a Memorandum Opinion of this Court; *Lowry Hospital Association v. Commissioner, supra; Harwood Associates, Inc. v. Commissioner*, 63 T.C. 255, 263 (1974); *Colombo Club, Inc. v. Commissioner*, 54 T.C. 100, 107 (1970), affd. per curiam 447 F.2d 1406 (9th Cir. 1971). Moreover, with respect to the revocation of determination letters for retirement plans, respondent has adopted the following rules set out in Rev. Proc. 72–3, 1972–1 C.B. 698, 705, sec. 13.05 (Rev. Proc. 75–47, 1975–2 C.B. 581, 582, sec. 4.01; Rev. Proc. 72–6, 1972–1 C.B. 712, sec. 5.03):

> Except in rare or unusual circumstances, the revocation * * * of a ruling will not be applied retroactively with respect to the taxpayer to whom the ruling was originally issued * * * if (1) there has been no misstatement or omission of material facts, * * * and (5) the taxpayer directly involved in the ruling acted in good faith in reliance upon the ruling and the retroactive revocation would be to his detriment.

See also Statement of Procedural Rules, 26 C.F.R. secs. 601.201(m) and 601.201(*l*)(5) (1979).

In the initial application for qualification of the profit-sharing plan, petitioner answered the question "Rate of employee contribution, if fixed" with the formula "10 percent of compensation." If that statement had been accurate, the profit-sharing plan would not have been defective. Yet the statement was not accurate. Petitioner agrees with respondent that the actual formula is 6 percent of the first $7,800 of compensation and 12 percent in excess of that amount. Indeed, in response to the same question on the 1976 application, petitioner gave the formula which the parties agree is the actual one. Therefore, it is clear that the initial application contained a misstatement of a fact.

The parties agree that the profit-sharing plan violates the antidiscrimination requirement of section 401(a)(4) because it is integrated with Social Security to the extent of 100 percent while the preexisting pension plan is integrated to the extent of 86 percent.[11] One informed of the extent of integration for the pension plan would realize that the combined plans result in excess integration. Hence, the misstatement of fact is material.

---

[11]See n. 2 *supra.*

Petitioner's initial application thus lacks an absence of a misstatement of a material fact, one of the factors upon which Rev. Proc. 72–3, *supra,* conditions nonretroactive application of a revocation.

Petitioner also charges respondent with lack of diligence in its review of the application and thus with responsibility for the erroneous initial grant of qualified status to the profit-sharing plan. Had the District Director examined information in his files which was submitted in connection with the application for qualification of the pension plan, petitioner claims, he would have discovered excess integration. Petitioner has, we believe, misconceived respondent's function in issuing determination letters as to qualification of new plans. Such letters are based not on an independent investigation but rather on the information submitted to him; for the purpose of the determination, this information is accepted as correct. *Thompson v. Commissioner,* 71 T.C. 32, 37 (1978); Statement of Procedural Rules, 26 C.F.R. sec. 601.201. Accord, *Houston Lawyer Referral Serv. v. Commissioner,* 69 T.C. 570, 573 (1978). Therefore, respondent was not required to independently examine and analyze the pension plan in order to determine whether the information provided on the application for qualification of the profit-sharing plan was correct.

To support its view that respondent abused his discretion, petitioner cites *Lansons, Inc. v. Commissioner, supra,* and *Time Oil Co. v. Commissioner, supra.* In *Lansons,* we held that respondent's retroactive revocation was arbitrary and capricious because, in part, there had been no misstatement or omission of material facts. *Lansons, Inc. v. Commissioner, supra* at 787. The misstatement of a material fact in the instant case renders it distinguishable. The excerpt cited by petitioner from *Time Oil* ascribes to respondent the fault for the trustee's failure to make required distributions from the pension plan; the Ninth Circuit thus felt that the taxpayer, which had not substantially benefited from the failure, merited judicial charity. *Time Oil Co. v. Commissioner, supra* at 239. As we have indicated, we do not agree with petitioner that respondent is at fault in the instant case.

Although it erred in establishing an excessively integrated profit-sharing plan, petitioner argues that the error was innocent. Petitioner further claims that if it misstated or omitted a

material fact on the initial application for a favorable determination with respect to the profit-sharing plan, the misstatement or omission was also innocent. Finally, it asserts that it relied in good faith on the original favorable determination. Hence, it concludes that retroactive revocation contravenes the fifth condition of Rev. Proc. 72–3, *supra.*

We have before us no evidence as to whether petitioner's errors were innocent or its reliance based on good faith. Moreover, under the guidelines, fulfillment of the fifth condition, good faith reliance, does not enable a plan to qualify for nonretroactive application if the employer has misstated a material fact and has thereby failed to satisfy the first of the essential conditions. Even if petitioner's misstatement were innocent, the case law would support respondent's position. Without discussing Rev. Proc. 72–3, *supra,* this Court has sustained a retroactive revocation of a favorable determination which was based on a misunderstanding on the part of the revenue agent, pointing out that the Commissioner "was not in possession of all the material facts when making the determination which he later deemed it appropriate to withdraw." *Harwood Associates, Inc. v. Commissioner,* 63 T.C. at 263.

Petitioner states that its Federal income tax returns were audited for 1972 and 1973 and that the issue of qualification of the profit-sharing plan was not raised on audit. It thus argues, in effect, that approval of the plan on audit estops respondent from later disqualifying the plan. Yet the profit-sharing plan, excessively integrated from the outset, was established prior to the audit. The date of the audit is not in evidence. However, an audit for the years 1972 and 1973 could hardly have been completed before the normal expiration of the remedial amendment period on July 30, 1973. Hence, at the time of the audit, the time had expired for petitioner to extend the period during which the plan could be amended.

To reflect the foregoing,

*Decision will be entered for the respondent.*